WMP/JMK
F. #2013R00505

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

15 M 0562

------------------------------X

UNITED STATES OF AMERICA

- against -

GREGG R. MULHOLLAND,
    also known as "Stamps"
    and "Charlie Wolf,"

               Defendant.

**To Be Filed Under Seal**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANT

(18 U.S.C. §§ 371, 1956(h))

------------------------------X

EASTERN DISTRICT OF NEW YORK, SS:

        THOMAS MCGUIRE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between May 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and

deceit upon investors and potential investors in various publicly traded companies, in connection with the purchase and sale of investments in the various publicly traded companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant GREGG R. MULHOLLAND, together with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

Upon information and belief, in or about and between May 2011 and September 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," together with others, did knowingly and willfully conspire to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (a) with the intent to promote the carrying on of specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(A), (b) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i), and (c) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the FBI for approximately 12 years. I am currently assigned to an FBI squad which investigates securities fraud, wire fraud and other financial crimes. During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information. During the course of these investigations, I have served as the lead investigator in the investigation and prosecution of persons involved in securities fraud, among other crimes.

2. I have personally participated in the investigation of securities fraud conspiracy and money laundering conspiracy by the defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," among others, as discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents and an undercover law enforcement agent (the "Undercover Agent") involved in this investigation, (c) my review of consensual recordings and videos, (d) discussions with a cooperating witness ("CW-1")[1] and review of documents provided by CW-1, (e) my review of five judicially-authorized wiretaps and emails obtained through judicially-authorized search warrants, and (f) bank records and public records, among other sources of evidence.

---

[1] CW-1 pleaded guilty to securities fraud conspiracy, in violation of 18 U.S.C. § 371, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), pursuant to a cooperation agreement. CW-1's information has proven reliable, and has been corroborated by such evidence as email communications, court-authorized wiretap intercepts and financial records.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated. Summaries of recorded conversations are based upon draft transcripts of these conversations, which are subject to revision.

## PROBABLE CAUSE

### I. Background

#### A. Overview of the Fraudulent Scheme

4. In my training and experience, offshore management companies have historically been used by individuals to facilitate securities fraud, money laundering and tax evasion. Specifically, individuals committing securities fraud often use offshore management companies to set up and manage offshore entities. Through these entities, individuals launder illegal stock proceeds (usually derived by stock manipulation or false disclosure schemes), conceal their ownership of large percentages of stock of public companies in violation of federal securities laws, and manipulate the trading of public companies by trading in an illicit fashion through accounts maintained in the names of these entities. Stock fraudsters have traditionally used offshore entities to trade securities on their behalf in the public market, allowing the fraudsters to

4

conceal their involvement in the trading and manipulation of the securities for their benefit.

### B. Relevant Regulatory Principles and Definitions

5. The Foreign Account Tax Compliance Act ("FATCA") is a federal law enacted in March 2010 that targeted tax non-compliance by U.S. taxpayers with foreign accounts. FATCA requires U.S. persons to report their foreign financial accounts and offshore assets. Additionally, FATCA requires foreign financial institutions to report to the Internal Revenue Service ("IRS") certain financial information about accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers hold a substantial ownership interest.

6. An international business corporation ("IBC") is an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which is not permitted to engage in business within the jurisdiction in which it is incorporated. An owner of an IBC could deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for the IBC's true owner because an IBC's ownership records are typically not publicly available.

7. The term "beneficial owner" is defined under the rules of the U.S. Securities and Exchange Commission ("SEC"). It includes any person who directly or indirectly shares voting power or investment power (the power to sell a security). When a person or group of persons acquires beneficial ownership of more than 5% of a voting class of a company's equity securities registered under Section 12 of the Securities Exchange Act of 1934, they are required to file a Schedule 13D with the SEC. Schedule 13D reports the acquisition and other information within ten days after the purchase. The schedule is filed with the SEC and is provided to the company that issued the securities and each exchange on which the security is traded. Any material changes in the facts contained in the schedule requires a prompt amendment.

8. The term "nominee" in the securities fraud context refers to a person or firm into whose name securities or other properties are transferred in order to facilitate transactions, while concealing the customer as the actual owner. A "nominee account" is a type of account in which a stockbroker holds shares belonging to clients in the name of a sham entity or another individual. The use of nominees and nominee accounts is designed to conceal the true ownership interest of the customer.

9. "Microcap" or "penny" stocks refer to stocks of publicly traded U.S. companies which have a low market capitalization. Microcap stocks are often subject to price manipulation because they are thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock are often controlled by a small group of individuals, which enables those in the group to control or orchestrate manipulative trading in those stocks.

10. Wash trades are purchases and sales of securities that match each other in price, volume and time of execution, and involve no change in beneficial ownership. For example, a wash trade takes place when Investor A buys 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B. Matched trades are similar to wash trades but involve a related third person or party who places one side of the trade. For example, a matched trade takes place when Investor A buys 100 shares at $5.00 per share of Company A through a broker, while Investor B, who coordinates with Investor A, simultaneously sells 100 shares at $5.00 per share of Company A through a broker. Both wash trades and matched trades are used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

## C. The Related Indictment

11. On September 9, 2014, an indictment was unsealed in the Eastern District of New York charging Robert Bandfield, also known as "Bob Bandfield," Andrew Godfrey, Kelvin Leach, Rohn Knowles, Brian De Wit, Cem Can, also known as "Jim Can," IPC Management Services, LLC, IPC Corporate Services Inc., IPC Corporate Services LLC, Titan International Securities, Inc., Legacy Global Markets S.A., and Unicorn International Securities LLC (collectively, the "Indicted Defendants"), with, inter alia, conspiracy to commit securities fraud, 18 U.S.C. § 371, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). See United States v. Bandfield, et al., 14-CR-476 (ILG).

12. The indictment alleges that in or about and between January 2009 and September 2014, the Indicted Defendants, together with others, devised and engaged in a scheme whereby they agreed to: (a) defraud investors and potential investors in various U.S. publicly traded companies through, inter alia, fraudulent concealment of their clients' true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies; (b) defraud the United States by facilitating their clients' efforts to impede, impair, obstruct and defeat the lawful governmental functions of the IRS in the ascertainment, computation, assessment and collection of revenue, specifically federal income taxes; and (c) launder money by facilitating for their clients financial transactions to and from the United States, which transactions involved proceeds of fraud in the sale of securities.

13. The indictment further alleges that the Indicted Defendants created various bank accounts through which passed approximately $500 million connected to their clients, including more than 100 U.S. citizens and residents.

## II. The Fraudulent Scheme

### A. The Defendant, His Co-Conspirators and Relevant Entities

14. IPC Management Services, LLC, IPC Corporate Services Inc. and IPC Corporate Services LLC (collectively, "IPC CORP"), with principal places of business in Belize City, Belize, were offshore management companies that marketed themselves on their website as providing, inter alia, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts.

15. Legacy Global Markets S.A. ("LEGACY") was an offshore broker-dealer and investment management company with its principal place of business in Panama City, Panama, and an office in Belize City, Belize. LEGACY marketed itself on its website as a fully licensed broker-dealer, regulated by the International Financial Services Commission ("IFSC") of Belize, which provided investors with full access to the major global exchanges worldwide from a single investment account. LEGACY emphasized that its management consisted of seasoned executives who had extensive experience in the offshore financial industry and distinguished backgrounds ranging from top-performing financial advisors to experts in banking, public policy, securities law and regulatory compliance.

16. Titan International Securities, Inc. ("TITAN") was an offshore broker-dealer and investment management company with its principal place of business in Belize City, Belize. TITAN marketed itself on its website as a fully licensed broker-dealer, regulated by

the IFSC of Belize, which serviced, inter alia, the Over-the-Counter ("OTC") markets for both corporate and individual clients. TITAN emphasized that it considered client confidentiality paramount and adhered to Belize's strict privacy laws.

17. Unicorn International Securities LLC ("UNICORN") was an offshore broker-dealer and investment management company with its principal place of business in Belize City, Belize. UNICORN marketed itself on its website as a fully licensed broker-dealer, regulated by the IFSC of Belize, which provided investors with full access to the major global exchanges worldwide from a single investment account. UNICORN emphasized that its clients could "trade with confidence" because, inter alia, information about beneficial owners, shareholders, directors and officers was not filed with the Belize government and not available to the public.

18. The defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," a dual U.S. and Canadian citizen, who was born in the United States, secretly owned and controlled LEGACY from approximately 2012 to 2014. During this time frame, MULHOLLAND resided in California. MULHOLLAND was one of IPC CORP's largest clients.

19. Brian De Wit, a citizen of Canada, was the President of LEGACY. De Wit worked at LEGACY's office in Panama City, Panama. From approximately 2012 to 2014, De Wit worked for the defendant GREGG R. MULHOLLAND.

20. CW-1, a U.S. citizen, is an attorney with a law office in Utah. CW-1 was licensed to practice law in Utah and the country of Bolivia. In or about 2014, CW-1 was the Chairman, Director and Secretary of LEGACY.

21. Robert Bandfield, also known as "Bob Bandfield," a U.S. citizen, founded and controlled IPC CORP. Bandfield worked at IPC CORP's office in Belize City, Belize.

22. Andrew Godfrey, a citizen of Belize, was employed by IPC CORP and worked at IPC CORP's office in Belize City, Belize. Godfrey was the primary contact at IPC CORP for its clients.

23. Kelvin Leach, a citizen of the Bahamas, was the President of TITAN. Leach worked at TITAN's office in Belize City, Belize.

24. Rohn Knowles, a citizen of the Bahamas, was employed by TITAN as the Head Securities Trader. Knowles worked at TITAN's office in Belize City, Belize.

25. Cem Can, also known as "Jim Can," a citizen of Canada, was the President of UNICORN. Can worked at UNICORN's office in Belize City, Belize.

### B. The Undercover Operation

26. Beginning in approximately November 2012, a law enforcement agent posing as a stock promoter engaged in fraudulent trading activity (the "Undercover Agent") was directed by John Doe 1, an employee for the now-defunct Bahamas-based broker-dealer Gibraltar Global Securities, Inc. whose identity is known to your deponent, to TITAN and LEGACY. John Doe 1 advised the Undercover Agent that TITAN and LEGACY could establish an IBC for the Undercover Agent to facilitate his fraudulent stock promotion business.

27. In or about January 2013, the Undercover Agent placed consensually-recorded telephone calls to Andrew Godfrey and Kelvin Leach. During these telephone calls, the Undercover Agent explicitly stated that he was a U.S. citizen who was interested in opening an offshore brokerage account with TITAN. The Undercover Agent added that he was a stock promoter who wanted to conceal his ownership of stocks and money transfers in order to avoid

10

scrutiny from the SEC and the IRS. Leach informed the Undercover Agent that TITAN did not open individual accounts in the name of U.S. citizens but explained that TITAN could open a brokerage account for the Undercover Agent through an IBC that could be created by IPC CORP.

28. Shortly thereafter, Godfrey informed the Undercover Agent that IPC CORP could establish a corporate structure that concealed the Undercover Agent's ownership interest in his brokerage account at TITAN, which would provide the Undercover Agent with the desired protection he sought from the SEC and the IRS. Specifically, Godfrey explained that IPC CORP would establish a limited liability company ("LLC") and an IBC for the Undercover Agent and designate IPC CORP's employees as the beneficial owners, or more appropriately, the nominees.[2] In this fraudulent structure designed to conceal the Undercover Agent's control and ownership, the IBC, which opened the Undercover Agent's brokerage account at TITAN, would be owned by the LLC and the Undercover Agent's name would not be associated with either entity.

29. By October 2013, the Indicted Defendants had established the IBCs, the LLCs and the brokerage accounts at TITAN and LEGACY for the Undercover Agent to enable him to conceal his true beneficial ownership.

30. On or about November 6, 2013, the Undercover Agent met with Robert Bandfield and Andrew Godfrey at IPC CORP's office in Belize. The entire meeting was recorded by the Undercover Agent with a recording device. During this meeting, Bandfield and Godfrey explained, in great detail, how IPC CORP assisted U.S. citizens, like the Undercover Agent, in evading U.S. laws and regulations, including securities laws and regulations, by establishing sham IBCs and LLCs. Bandfield revealed that he had incorporated more than 5,000 sham companies

---

[2] Based on my training and experience investigating securities fraud cases, I believe that Godfrey's reference to a "beneficial owner" is actually to a nominee who will fraudulently represent themselves as "beneficial owners" in order to conceal the identity of the true beneficial owner.

11

and then suggested means by which the Undercover Agent could circumvent the SEC's reporting requirements by concealing his beneficial ownership of more than five percent of a public company's stock through nominee accounts.

31. That same day, the Undercover Agent also met with Rohn Knowles. Knowles confirmed to the Undercover Agent that TITAN could not open an account for U.S. citizens, like the Undercover Agent, without IPC CORP's IBC and LLC arrangement. When the Undercover Agent explicitly indicated that he wanted to engage in fraudulent market manipulation through wash trades and matched trades between two accounts controlled by him, Knowles stated that he could orchestrate those trades through close coordination with Brian De Wit at LEGACY, and stated that "me and Brian do it all the time for other clients."

32. A few months later, on or about March 4, 2014, the Undercover Agent met again with Robert Bandfield and Andrew Godfrey at IPC CORP's office in Belize.[3] This meeting was also recorded by the Undercover Agent with a recording device. During this meeting, Bandfield and Godfrey touted, inter alia, IPC CORP's success in establishing fraudulent corporate structures, including six IBCs and two LLCs for the Undercover Agent in order to conceal the Undercover Agent's true beneficial ownership of the brokerage accounts at TITAN, LEGACY, UNICORN and two additional broker-dealers. Bandfield and Godfrey advised the Undercover Agent that the designated nominees, who included a security guard and courier, would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction.

---

[3] Following this meeting, the Undercover Agent met with Cem Can, who also advised the Undercover Agent on methods to conceal his true beneficial ownership and fraudulent trading activities.

### C.     Mulholland's Role in The Fraudulent Scheme

33.    In or about 2010, the defendant GREGG R. MULHOLLAND, also known as "Stamps" and "Charlie Wolf," became a client of LEGACY following the demise of Bahamian-based Gibraltar Global Securities, Inc., which was sued by the SEC. By June 2011, MULHOLLAND had moved substantially all of his securities and cash holdings from Gibraltar to LEGACY. At this time, LEGACY was owned by a group of individuals, whose identities are known to your deponent. Brian De Wit was the manager of LEGACY and CW-1 served as its "General Counsel." In reality, CW-1's primary role was to authorize and facilitate fund transfers for LEGACY. At this time, MULHOLLAND accounted for approximately 75% of LEGACY's business.

34.    After the enactment of FATCA in March 2010, LEGACY, like other offshore brokerage firms, put disclaimers on its website that it would not accept U.S. clients. Contrary to these representations, LEGACY continued to have U.S. clients, including the defendant GREGG R. MULHOLLAND, so long as the clients concealed their U.S. ties through IPC CORP's fraudulent IBC and LLC structure. In furtherance of this scheme designed, in part, to circumvent FATCA's requirements, Robert Bandfield formed an affiliate of LEGACY in Belize. Bandfield referred IPC CORP's clients to LEGACY in exchange for approximately 50% of the commissions paid by the clients. Shortly after the enactment of FATCA, MULHOLLAND became one of IPC CORP's largest clients.

35.    The defendant GREGG R. MULHOLLAND controlled a group of individuals, whose identities are known to your deponent (hereinafter referred to as the "MULHOLLAND Group"), who were engaged in the widespread fraudulent stock manipulation of U.S. publicly traded companies. The MULHOLLAND Group spread its fraudulent trading

13

activity across various offshore brokerage firms, including LEGACY and TITAN. To further facilitate his fraudulent scheme, in or about February 2012, MULHOLLAND purchased LEGACY for approximately $1 million. Consistent with his practice, MULHOLLAND concealed his purchase of LEGACY by purchasing it through the Contender Trust, a purpose trust set up by Bandfield and IPC CORP. MULHOLLAND directed CW-1 to fund the Contender Trust with proceeds from his fraudulent trading activity at LEGACY, which was accomplished through one of the five law firm accounts controlled by CW-1.

36.     In addition to utilizing CW-1 and IPC CORP's fraudulent corporate structure to conceal his fraudulent activity, the defendant GREGG R. MULHOLLAND took further measures to conceal his identity, which included using a number of aliases and burner phones to communicate with his co-conspirators. CW-1 has informed your deponent that MULHOLLAND used, inter alia, the following code names: "Stamps" and "Charlie Wolf." Below are some email exchanges that corroborate MULHOLLAND's use of aliases to conceal his identity. On June 10, 2011, in response to an email concerning a data purchase agreement sent to him by MULHOLLAND at mrcwolf@vzw.blackberry.net, CW-1 stated, "Greg: No message came over???," to which MULHOLLAND replied, "Didn't mean to send sorry." On August 13, 2011, CW-1 sent an email to MULHOLLAND at stamps1@tmo.blackberry.net concerning MULHOLLAND's purchase of a real estate property in San Juan Capistrano, California through "Vision Crest Consulting Group," attaching four documents, and stated, "Greg: Your name didn't appear on the face page of any documents, but you will notice that 'Mulholland 30302' appears in small letters on the bottom right-hand corner of each document after the face page. Sorry that I didn't pick that up until I started initialing pages." A few minutes later, CW-1 sent a follow-up email to MULHOLLAND at stamps1@tmo.blackberry.net and stated, "Greg:  I just

saw Karen's corrections naming Vision Crest in the bottom right-hand corner after the face pages. She was really on the ball and sent it over last night (apparently after you spoke to her). I will execute the new docs, scan them and get them back to her right now. I apologize for the false alarm." In response, MULHOLLAND stated, "Perfect, Thanks." MULHOLLAND used Vision Crest Consulting Group, which received $8 million in fraudulent proceeds through CW-1's law firms, to purchase and renovate the house in in San Juan Capistrano, California. Additionally, in a telephone call intercepted pursuant to judicially-authorized wiretaps, MULHOLLAND, using the alias "Charlie Wolf," called Andrew Godfrey at IPC CORP on May 9, 2014, and stated, in part, "just chasing down to see if you have any more names for those IBCs that we bought . . . we talked and you had five or so." In response, Godfrey stated, "Yea, I was . . . just getting ready to get on the phone with Brian [De Wit] because [CW-1] had also spoken to me about it." MULHOLLAND then stated, "Yea, we are working on it together."

37. IPC CORP's fraudulent IBC and LLC structure enabled the MULHOLLAND Group to conceal their fraudulent market manipulation behind a wall of sham companies and nominee accounts which enabled the members of the group to conceal their beneficial ownership of the stock and conceal the proceeds from their fraudulent trading activity in violation of U.S. securities and tax laws. In furtherance of this fraudulent scheme, MULHOLLAND directed De Wit and CW-1 to purchase IBCs and LLCs from IPC CORP. For example, on March 18, 2013, an IPC employee, whose identity is known to your deponent, sent an email to Brian De Wit, attaching a document with a list of IBCs for MULHOLLAND and stated, "Here are some companies owing for Mr. Mulholland. Please let me know when you will be sending the monies to Mariah [Bandfield's company]." The attached document lists 8 IBCs and the cost for each IBC is $1,000, which includes a $300 payment for the "Nominee SH," which I

believe to be nominee shareholder. As another example, on or about April 15, 2014, CW-1 sent an email to Robert Bandfield, listing 17 IBCs and stating, in part, "Can you help these clients with nominee beneficial owners for these IBCs? Right now they are owned by, I believe, four Nevis LLCs (maybe five) with Philippine owners of those LLCs. Each of these IBCs will require a separate beneficial owner. The client is prepared to pay whatever the fee amount is for these services." Upon information and belief, "the client" referenced in the email is MULHOLLAND. These are additional examples of MULHOLLAND's violation of U.S. securities law by concealing his controlling beneficial ownership of the stock of publicly traded companies through nominees.

38. In or about and between 2010 and 2014, the defendant GREGG R. MULHOLLAND, together with others, engaged in numerous "pump and dump" schemes involving U.S. public companies that traded on the OTC markets. Based on my training and experience, a typical pump and dump scheme is a scheme where a group of individuals who control the free trading or unrestricted shares of a microcap company fraudulently inflate the share price and trading volume of the targeted public company through, inter alia, wash and matched trades and paid promoters who issue false and misleading press releases. When the target company's share price reaches desirable levels, the individuals sell their free trading or unrestricted shares for substantial financial gain.

39. One example of the defendant GREG R. MULHOLLAND's fraudulent manipulation schemes involved the stock of Cynk Technology Corp, which traded on the OTC markets under the ticker symbol CYNK. On May 15, 2014, MULHOLLAND's telephone call to Brian De Wit was intercepted pursuant to a judicially-authorized wiretap. The following relevant conversation takes place between MULHOLLAND, using the alias "Stamps," and De Wit:

GM: Hey Brian, it is, uh, Stamps. How ya doing?

BD: Hey. Yep.

GM: I think you had Tom call you earlier today and I'm sure Phil called you right behind. We're torturing you a little bit on this CYNK.

BD: Uh-huh

GM: So, a couple of questions are – I know Phil's working on the CEO scenario right now, you know, resignation. So we've got an awesome deal to go into it. Do you know who's holding the control block right now? . . .

BD: I don't quite know. You're going to have to be more specific than that. All I know is what we had and we held, and that's all I know, so –

GM: Ok, well no, we have all the free trading [shares]. So, I have you know the 32.5 million shares on deposit. We have all the other stuff coming back in cert form that the other firms sent out in certs. The only thing that I'm looking for right now is that roughly 210 million share control block – the one that's restricted – so we can put it in the hands of the company that we are vending in.

\* \* \*

Based on the above conversation, it is clear that MULHOLLAND concealed his beneficial ownership and control of CYNK stock. Moreover, as is evident from the stock chart below, CYNK was a classic pump and dump scheme. Prior to this conversation between MULHOLLAND and De Wit on May 15, 2014, there had been no trading in CYNK stock since April 9, 2014, or for 24 trading days. On May 15, 2014, the stock closed at $0.06 per share following trading of 1900 shares. This was followed by no trading activity for another 21 trading days. Beginning on June 17, 2014, trading activity in CYNK took off with 367,400 shares traded on that day and the stock closed at $2.25 per share. From June 17, 2014 through July 10, 2014, CYNK's share price increased from $2.25 to $13.90 and more than 2 million shares were traded. Based on my training and experience, these incredible and unexplainable increases in stock price for a company with no revenue or assets is the result of fraudulent market manipulation.

Moreover, MULHOLLAND's admission that the MULHOLLAND Group controlled "all the free trading" or unrestricted shares of CYNK demonstrates that the MULHOLLAND Group was responsible for the fraudulent manipulation of CYNK. This is further corroborated by CW-1 who has informed your deponent that the MULHOLLAND Group was involved in the manipulation of CYNK.



40. The defendant GREGG R. MULHOLLAND typically directed the proceeds from his fraudulent trading activity to one of five law firm accounts that were set up by CW-1 for the primary purpose of laundering fraudulent proceeds and transmitting them back to, inter alia, the MULHOLLAND Group and its co-conspirators, including the paid promoters who

18

assisted with the pump and dump scheme. In sum, MULHOLLAND, together with others, transferred approximately $300 million of fraudulent proceeds through CW-1 and his law firm accounts, often to accounts in the U.S. that were controlled by MULHOLLAND and his co-conspirators.

## III. CONCLUSION

WHEREFORE, based on the foregoing, your deponent respectfully requests that an arrest warrant be issued for the defendant GREGG. R. MULHOLLAND so that he may be dealt with according to law.

Because public filing of this document could result in a risk of flight by the defendant GREGG R. MULHOLLAND, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

Dated:  Brooklyn, New York
        June 18, 2015

_____
THOMAS MCGUIRE
Special Agent, FBI

Sworn to before me this
18th day of June, 2015

_____
THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

19